Per Curiam.
This bill states, that Mark Robertson, in the month of October, 1783, agreed to sell two locations or descriptions of land, of 5,000 acres each, situated on Duck River and Fountain Creek, in the middle district of the State of North Carolina, and to superintend the surveying thereof. The said James Holland agreed to convey to said Mark Robertson one equal fourth part of the lands, to be secured as soon as titles should be obtained. And as evidence of and security for performance of said agreement, said James Holland gave his bond, on the 8th of October, 1783, in the penalty of ¿£1,000, with the condition following : “ That whereas the said Mark Robertson hath furnished the said James Holland and William Gilbert with two locations containing 10,000 acres, upon Duck River and Fountain Creek, and also is faithfully to superintend the surveying of the said land, and provided the said Holland and Gilbert should obtain indefeasible titles to the same by virtue of said entries and lands when surveyed, then, and in that case, the said Holland and Gilbert should transfer and convey to the said Robertson, his heirs and assigns forever, 2,500 acres of the said land, of equal value in proportion to the quantity, then the above obligation to be void, otherwise to remain in full force and virtue.” Before *224 the execution of the bond, the entries had been made in the office of John Armstrong, kept at Hillsborough, in the following words : “ No. 421,25th October, 1788, James Holland 5,000 acres in Greene County, on the western waters, lying on Duck River, beginning on the south side of the river, about a mile below the mouth of Fountain Creek, and extending up both sides of the * river, including the mouth of Fountain Creek, for complement. No. 542, 27th October, 1783, William Gilbert, 5,000 acres, on the western waters, on both sides of Fountain Creek, on the south side of Duck River, about three miles above the mouth of the creek, and extending up both sides of the river for complement.” These entries were actually surveyed under the superintendence of Mark Robertson ; and grants vesting valid and indefeasible titles therein issued the 10th of July, 1788. That Holland holds still, of the lands granted to himself, about 1,200 acres; that the remainder he hath sold at different times, and he claims the land granted to Gilbert, but by what title is not known. The bill then states Elijah Robertson’s interest in a large number of land contracts, and, among others, in Holland’s contract, and recovered the lands ; that Mark Robertson died, and left his wife, Mary and James Robertson, executor and executrix, who proved the will; and in 1798 Elijah Robertson died, leaving the complainants his heirs at law ; that on the 25th of September last., said Mary, having before intermarried with John McNairy, and said John, by indorsement on said bond on the back thereof, with their names thereto subscribed, assigned the said bond to John Childress, in trust for the complainants; that the plaintiff Childress hath applied to the defendant to convey according to the said bond, but he hath failed, and prays a specific performance, &c. The answer states, that on the declarations of the said Mark that said two locations were for lands of the first quality, and equal in value to any in the western country, he was induced to enter into the contract, and signed the bond of the import of that in the bill stated, and for many years after fully intended to execute the condition ; and it would now give him pleasure to do so, if he could in justice to himself. He admits Childress applied to him for a specific execution soon after the extinguishment of the Indian title, but, from his solicitude, he suspected * the claim was not good. And this defendant employed General Isaac Roberts to survey the same, when he discovered the de *225 ception, and that the land, instead of being of the first quality, was of the most inferior quality; that, of the first quality, there were not 300 acres, and, of the whole, not one half fit for cultivation ; that he suggested to said Mark that, to avoid bad land, it would be better to have smaller locations; that he replied nothing would be gained by that, and, trusting to these and similar declarations, he had entered into the bond ; that he now knows these statements, are false, and that he was deceived ; but, from the lapse of time and death of witnesses, it is difficult to support this averment; and brings before the court the bond and the faithful surveying, &c., that this has not been done, but is fair contrary to the locations; that the Gilbert tract, according to his opinion and the law, ought to have been oblonged up the creek; that, by oblonging it across the creek, it afforded Elijah Robertson, who superintended the surveying, an opportunity of laying a warrant not located there, for himself, and thereby takes 5,000 acres. He believes there are no interfering claims; but that, if Mark Robertson had faithfully superintended the surveying, the lands would have been of one third more value. He charges that he hath been deceived and injured by the surveying so as to enable Elijah Robertson to take so much good land, which ought to have been included in his survey. The defendant admits he offered to convey 2,500 acres, being the part wrongfully taken in surveying, which was refused ; that he told said Childress, if he intended to pursue, his claim, to bring suit; but why protracted till now he knows not; that said offer was not made from a legal or equitable obligation, but because the bond was not worth attending a suit at law for. He further answers, that soon after the entries were made he sold three fourths of the Holland tract, reserving one fourth on the northeast * corner for the compliance with his contract; but when he discovered the imposition, he settled it himself, and hath improved it; that, with regard to the other tract, Gilbert was to have conveyed to him, but died without having done so; and thereafter he took legal means to realize it, and recovered judgments, to satisfy which the land -was sold to him as the highest bidder for $3,050, and hath the sheriff’s deed, which he believes to be valid, and that he hath been put to great expense in securing it. Several grounds of defense are taken upon argument in this case, some of which are predicated upon the answer, and others raised upon the testimony. The first *226 ground is, that the defendant was misled by the misrepresentations of Mark Robertson, and his statements before the purchase of the locations, in saying the land was of the first quality and equal to any in the western country; that, by these declarations and averments of the said Mark, he was induced to enter into the contract; that, the fact being that these locations are not of lands of the first quality, he was deceived, and therefore not bound to a specific execution. To prove this defense, and that Mark Robertson made these representations, the deposition of Colonel Benjamin Herndon is relied on, which states that, in a conversation deponent had with General James Robertson relating to the entering lands on Duck River, the General recommended his brother Mark as knowing the lands better than himself, and introduced the said Mark to this deponent ; and, while in conversation relative to those lands, Major James Holland came into the room, and much was said about the quality of the lands of which the said Mark had locations, and the said Mark stated to the deponent that the locations he was then selling, and did sell to him, covered lands of the first quality ; that they joined lands he, the said Mark, had located for Major Holland, which he said was first-rate land. This is the principal passage relied upon, and, taken in conjunction with another * which I shall afterwards notice, constitutes the proof on this part of the case. I cannot see, I confess, this testimony in the light it is viewed by the defendant, as giving information to him, and containing a description of the lands and a representation of their quality before his contract or agreement for the purchase of them ; but quite the reverse. This is a conversation between Mark Robertson and Herndon, which took place at a particular time, to wit, when Mark Robertson was selling a location to the deponent; and it refers to an antecedent time when the defendant’s purcháse is mentioned, to a time that is passed then, to an act that is done and finished before the then present time of this conversation. The words are, had located for Major Holland, or, in other words, had sold to Major Holland. It is too late information that is received after an act is done, to influence the agent in doing tliat act. This seems to me to be the plain and obvious meaning of the deposition. An inference was attempted in argument to be drawn from the number of the entries of Holland and Herndon, from their dates and relative position on the books in the office, to prove that this conversation *227 must relate to the purchase of Holland as well as of Herndon, and show that both purchases were at the same time. But I do not think that anything material is to be derived from these circumstances. The persons intending to make entries in Armstrong’s office were there some time before it opened, for the purpose of being prepared for the opening, and to be ready to seize the first opportunity of making their respective entries. It followed that those, who were not provided with locations before they got there would, according to circumstances, supply themselves, but at the latest, before the opening. The contracts, therefore, for the locations, to a certain extent, at least, must have been all made before the first entry was made; and no argument, as it seems to me, can be drawn from their position on the entry book as to * the time of the purchase of the location by the enterer. It was therefore a matter of course for Mark Robertson, who was there for the purpose of selling locations, to do so, as he could find a purchaser; and no inference can be drawn from the nature of the business but this one, that the sales were made at some time or other before the opening of the office, and before the entries were made. The other part of the deposition on which reliance is placed is the following question by the defendant, and the answer thereto: Do you not think the statement made to me by the said Mark Robertson, respecting the quality of said lands, was not sufficient to cause me to believe they were first-rate lands? Now these statements in this question and answer evidently refer to the conversation between the deponent and Mark Robertson above alluded to, upon the deponent’s own purchase, stated in the first part of the deposition, and to no other statement, and alter not in any manner the import of the said conversation, which has already been observed upon. The answer to the question, it is true, contains the opinion of the deponent, but that has no bearing on the ground of defense it is introduced to support. It is to be remarked, however, that the answer to the question corrects and negatives one part of the question, that part which implies the statement is made to Holland. For the answer says, Statements by said Mark respecting, &c., &c., omitting the designating words “ to you,” which would have been responsive to the question, and implies the statements were made to the deponent, and refers to the former conversation* which in its turn explains this mode of expression, and justifies the *228 correctness of the exposition now given to it. From this vie*w of Herndon’s deposition, that the description of the land therein mentioned was made to Herndon, and not to Holland, upon a sale of a location to Herndon, and evidently subsequent to the sale to Holland of his locations by Mark Robertson, * it cannot be said that he was. induced thereby to enter into the contract respecting them, relying upon their quality. And another circumstance exists in this case which has weight with me, and tends to prove that my understanding of the above deposition of Herndon is a correct one. It is 'this : that if these representations had been made, and such as are charged, and before, the purchase, how are we to account for the manner of the defendant’s afterwards proceeding in the contract, by entering into the bond.without noticing them therein. Can it be supposed that so important an ingredient in the substance of a contract was not known to him ? We are not to suppose any such thing ; we must take it for granted that it did not exist, or it would have been made a part of the evidence of the contract, or, in other words, be inserted in the bond ; and it is to be mentioned that it is nowhere in the answer expressly charged that these representations were made before the contract or purchase of the locations, but only before he entered into the bond. If it had been his agreement to have first-rate land, would he have entered into the bond without this stipulation ? What could have induced him to do so ? He was not circumvented by any artifice ; he was not surprised by any accident; he was not under any pressure of situation, but the reverse. He had got the locations, and his entries attached to them, on the books.in the office. Mark Robertson might be said to be in his power. Added to all this, he wrote the bond himself, and was w-ell acquainted with the legal import of the instrument. The proof, therefore, not supporting this ground of defense, it must fail.
The second ground of defense is,’ that Mark Robertson, attending at Hillsborough for the purpose of selling locations, is to be considered in the , same light as if he had got, the warrants to locate as a locator, and is liable for a faithful discharge of his duty ; that these numbers being early ones, to wit, 421, 442, * ought to have been laid on better land. It is in proof, that at that date, to wit, in 1783, it was generally believed that all the land on Duck River was land of the first quality, that *229 being covered in many places with cane, and then untrodden by domestic animals, it had a much better appearance than afterwards, when it had been inhabited for some time. It was further proved, that from ■ the danger justly to b,e apprehended from the Indians, the knowledge of these lands was not particular and precise as at an after period when, danger was removed, and when they could be explored at leisure and in safety. It was further proved, that going a distance of 20 miles west, down the river, almost every tract would be better, that going a like distance east, up the river, every tract would be worse'; that taking the land upon Duck Fiver from head to foot, it was an average tract;' that Fountain Creek was a large creek, that it traversed both tracts with Silver Creek, its branch, passing through the northeast corner of the Gilbert tract, a'nd entering the Holland tract near the southeast corner, and running into Fountain Creek near the centre of that tract; that on these creeks were several mill-seats, and also one on Duck Fiver on the Holland tract. Taking all these circumstances into view, I cannot say that the locator has not done his duty in this instance. A perfect knowledge of the country at that day was not to be expected, and with less than this it might have been supposed that Holland’s tracts stood as good a chance as any for good land.
A third ground of defense is, that Mark' Fobertson did not superintend the surveying of these tracts faithfully. The survey of the Holland tract began 275 poles, below the mouth of Fountain Creek, on the river,- and ran south 30, west 130 poles, thence south 880 poles thence east, 820 poles, thence north 1,010 poles, crossing Duck Fiver, then 760 to the beginning. If the second line was extended north from the second corner, it would pass the beginning 60 poles * distant at a point due west therefrom, which would be near the river, so that the survey covers within a few acres the same land as if it had begun one mile below the mouth of Fountain Creek. The Gilbert tract begins in the southwest corner of the Holland tract, and runs west 74 poles, but measures 94 poles, then south 696 poles, then east 1,220 poles, crossing Fountain Creek at a little upwards of two miles from the southwest corner, then north to Holland’s line 696 poles, then west to the beginning, crossing Fountain Creek at nearly three miles from the northeast corner. All the testimony goes to *230 show that the Holland tract could not be laid to greater advantage than it has been done. With regard to the Gilbert tract, there are different opinions : some, that if it had been oblonged up the creek to Kindrick’s line, it would have been better; others, that the dif-. ference, if any, would have been little, paying due respect to the calls of the entry. It seems to me that the weight of evidence supports the latter position, and that I am not authorized to say that the surveying of this tract hath not been faithfully superintended. And further, this conclusion I should feel myself bound to draw from the testimony, if the party were permitted by law to direct the outline of the survey in any ratio he pleased between a square and an oblong, having proper regard to the calls of the entry. But according to the case of Kendricks and Dallum in this court, if the party by his entry does not express the figure of his survey, and the entry instructed the surveyor, he has no right afterwards to interfere and say, Such is the figure I wish the plat to form. If, therefore, the plat in this case had been rather disadvantageously placed, yet being legal, pursuing the calls of the entry and in conformity thereto, the defendant could not avail himself of this circumstance, and be permitted to allege against a legal execution of a survey, an unfaithful execution of it. Add to this, he made the entries himself before he entered into the bond, and * in contemplation of law was bound to know how they would be surveyed. The next- point made by the answer is, that the plaintiff’s claim at this distance of time came too late to be sustained by the court; that admitting he once had a right to come into this court for a specific execution, the failing for so great a length of time to exert this right precludes him from the remedy prayed for, and leaves him to his redress at law, if any he has. The facts are, that at the time these entries were made, Mark Robertson was a citizen of this place, and so continued till his death, and also, the complainants were, at the death of said Mark, and still are, citizens of this place ; the defendant was at the date of these entries a citizen of the State of North Carolina, and so continued until he removed to this State, about the year 1807,1808, or 1809; that, in the year 1792, he was here a short time upon business, when application was made to him for a specific performance of the present contract, which was not complied with; that after his removal into this State he was applied to in like manner, and even *231 pressed upon the subject, but he evaded it; one of their applications was made by Judge McNairy; the defendant resisted by alleging he could not be compelled beyond the penalty of his bond. The present suit was brought soon after the defendant was vested with the legal title to the Gilbert tract. For the defendant, on this point, were cited and relied on, 2 Powell, 250; Newland 224; 4 Dall. 347; Vern. 633. The principle in Powell is, that where one party has trifled or shown a backwardness in performing his part of the agreement, or has lain dormant for many years, equity considers this a good objection to a specific performance in favor of such an one ; especially if circumstances are altered in the mean time. New-land, nearly the same, says, that where the plaintiff hath consumed considerable time in unnecessary delay, the court will not c(insider him entitled to a specific performance, especially where a material * alteration hath taken place in the value of the property which is the subject of the contract.
My opinion is, that these authorities do not apply to the present case. It does not appear that the plaintiff hath shown a backwardness, and permitted his claim to lie dormant further than what, by the circumstances of this case, may be fairly accounted for. The grants issued in 1788; in 1792 the defendant came into this State for the first time afterwards. He was then applied to for a specific execution. Upon his removal into this State, he was applied to for the same purpose, and even urged upon the occasion; and finally suit was brought within a short time after he had procured a legal title to the Gilbert tract and became enabled to' perform his contract specifically. But why is it said in the books, that time raises an objection to a specific performance ? Because, say they, in one class of cases, it is evidence of a waiver, or an abandonment of the contract. But what kind of cases will raise this presumption and furnish a justification for the court to take this ground ? Surely not this kind, where the plaintiff has paid the full consideration, hath performed all on his side, and fully entitled himself to the benefit of an execution from the other. It would be an extraordinary presumption, this, indeed, and such as no case introduced warrants. The authorities, when looked into, show this, that upon a contract for the purchase of an estate generally, some deposit is made by the vendee, which he forfeits if he flies from the contract, or if the vendor flies, the vendee takes his deposit back again ; but *232 if either party insist upon a specific execution, then time is taken into view as an evidence of a waiver by the party applying or the plaintiff. It is but a presumption of waiver, however, and may be rebutted by'accounting for it, by assigning sufficient , reasons to justify or excuse the delay; as a correspondence respecting the title, clearing the title, and taking the necessary steps for this purpose ; and in such cases, * if the plaintiff hath not practiced unnecessary delay in making out his title, the court will not refuse him a specific performance because he afterwards suffers a period of time to elapse before he files his bill, wdiich, in case it had passed before he had taken steps to perfect his title, would have been an obstacle to such relief. Newland, 242, 247. But this appears to be the doctrine only in those cases where the claim for specific execution rests upon the circumstances of contract only, without payment of the consideration.- That time is considered as evidence of abandonment. Its application belongs not to such a case as the one under consideration; as little application has that class of cases cited where time joined to other circumstances, without reference to the question of abandonment, is of material consideration. This happens where, after the time for the performance of the contract, circumstances happen materially affecting the value of the property or the benefit of the contract; as in sales of reversions or remainders ; as the case from 2d Vernon is ; for by the dropping of a life, the value may be particularly affected, and besides, these contracts are induced by the pressure of the want of ready money. And were the plaintiff permitted, after lying by, speculating upon events, and heightening the necessities of his AI'endor by delay, to claim a specific execution, it would operate the greatest injustice. New. 244, 249. But these principles have no reference to the present case. The present and past value of these lands' has no relation to the circumstances of the parties. The plaintiff was not lying by from the accruing : of his right to the introduction of his suit, speculating upon events ;' he was not in the interim profiting by the use of the purchase' money, and calculating whether it would be most advantageous to enforce the contract, or to abandon it. He had paid the purchase money, or its equivalent, performed the sendees for the most part at the very commencement of the business. His equitable right was coeval with * the defendant’s legal right, and the substance of the con *233 tract was the land; and better or worse, advantageous or otherwise with regard to the penalty of the bond, he was compelled to take it; and the defendant had a right to enforce it, even after judgment at law, if the plaintiff had so proceeded, by a decree of this court, which must have viewed the same as the essence of the contract, and the penalty as the security only of the party for a performance. I cannot therefore see, upon the authorities cited, and the principles contained in them, that the complainants are ■precluded upon this ground of defense from the assistance of this court as prayed by their bill. The next ground of defense is not founded on the answer, but raised by the counsel upon the face of the grant to the Gilbert tract. The fourth line of that tract, proceeding from the southeast corner, calls to run north 696 poles to Holland’s line. This course and distance forms a line at right angles with the southern boundary line, and of equal length with the western boundary line. But by distinguishing the course and running from the southeast corner to Holland’s line, it would-form an acute angle with the southern boundary line, and would strike Holland’s line at a.point 320 poles west from the termination of the line run north, making a difference in the quantity of 679 acres. The plat annexed to the grant exhibits the said north line, and, from its termination, a line due west to the beginning, which line reaches Holland’s tract at 320 poles, and thence west to the beginning is the common line of both tracts. Upon these facts it is contended by the defendant’s counsel that the grant does not cover the land contained in the survey, and that therefore that part of the condition of the bond is not complied with which stipulates that Holland and Gilbert should obtain indefeasible titles to the land. To this it was answered by the plaintiff’s counsel, that the case in the Supreme Court of the United States, upon a question respecting lands in Sequatchie valley, governed * this case. It was said it was there decided that the plat appended to the grant controlled the call of the grant. The existence of this case does not seem to be questioned, but its authority, as binding in this court. It is true its authority is not conclusive, but I must see my way very clearly in the opposition to decide contrary to such a very respectable opinion. Independent of this ground, can it be said really that substituted titles have not been made to Holland and Gilbert on these entries ? There is at most an informality, but *234 I cannot see how this could be taken advantage of by any person to the prejudice o,f the defendant, without the greatest and most willful negligence. The act of 1801, ch. 101, makes the defendant’s deed, if according to the calls of the grant, evidence, notwithstanding, of the sale and transfer to him of the land intended to be granted, and authorizes him at any period to have the correction of the grant made. I should hesitate much if this cause turned upon this point, before I could be led to say that, under these circumstances, the title is not substantially indefeasible. The meáning of the clause in the condition by the parties, as it seems to me, was to secure against conflicting older claims, and thus the defendant has viewed it, for he makes1 no point of defense of this by his answer. The objection amounts to this ; the word opposite is left out by mistake ; for supply this word, and it is formally correct, and would then read thus, North 696 poles, opposite the Holland line.

Decree for the plaintiff.

See, as to the duty of locators, Hall v. Ross, 3 Hay. 200. As to lapse of time in bills for specific performance, Buchanan v. Brown, Cooke, 187; Smith v. Christmas, 7 Yer. 576; Cocke v. Evans, 9 Yer. 287. As to plats and certificates as evidence, Roberts v. Cunningham, Mar. & Yer. 73; Bell v. Hickman, 6 Hum. 398; Dallum v. Breckenridge, Cooke, 152; Patton v. Carothers, Cooke, 148; Mitchell v. Churchman, 4 Hum. 218; Polk v. Hill, 2 Tenn. 153; Tate v. Gray, 1 Swan, 73. See King’s Digest, 1751, 2878, 2912-23, 2925 et seq., 6001, 7925, 7927.